Estate of W. A. Brown, Deceased, Clyde Galt, Executrix v. Commissioner.
Estate of Brown v. Commissioner
Docket No. 89579.
United States Tax Court
T.C. Memo 1962-249; 1962 Tax Ct. Memo LEXIS 58; 21 T.C.M. (CCH) 1321; T.C.M. (RIA) 62249; October 24, 1962
*58 Marion W. Corbitt, Esq., P.O. Box 203, Cartersville, Ga., for the petitioner. Arthur P. Tranakos, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in estate tax in the amount of $1,632.03 against the Estate of Mrs. W. A. Brown. The decedent died on January 2, 1958. The issues presented relate to whether or not respondent erred in increasing gross estate (a) by increasing the value of miscellaneous property; (b) by increasing the value of the thirteen United States savings bonds, Series G and K, and (c) by increasing the value of nine parcels of real estate. Petitioner claims an increased deduction for additional attorney's fees. The allowance of counsel fees will be determined under Rule 50 or 51. I. Findings of Fact General W. A. Brown, deceased, (hereinafter sometimes referred to as decedent) died testate on January 2, 1958. Clyde Galt (sometimes hereinafter referred to as petitioner) qualified and was appointed executrix under the will of the decedent. On August 8, 1958, the executrix filed an estate tax return for the estate of decedent with the district director of internal *59 revenue, Atlanta, Georgia. The estate elected the date of death, January 2, 1958, as the date of valuation. II. Findings and Opinion "Other Miscellaneous Property" Under Schedule F of the Federal Estate Tax Return, petitioner included the following item: "Miscellaneous Furniture - $300." No other item was included in the schedule. The instructions on the return required inclusion of "personal effects." Included in the assets of the estate was a diamond ring which was not referred to in Schedule F or any other part of the return. The respondent, in his statutory notice, increased gross estate by $200 "to include a fair and reasonable valuation of decedent's diamond ring * * *." The executrix, Clyde Galt, testified that the diamond ring was included in the "Miscellaneous Furniture" item of Schedule F. Our observation of her, however, was that she was completely confused while on the stand and that she did not know whether or not the ring was included in any item of the return or what its value was. It would have been simple enough, of course, to include the ring as a separate item under Schedule F. No doubt it was omitted through oversight. The resulting confusion, however, *60 must be laid at petitioner's door. We find no basis for holding that petitioner has demonstrated error in respondent's determination as to this item. III. Findings and Opinion 13 United States Savings Bonds Thirteen $1,000 maturity value United States savings bonds, Series G and K, were reported by the estate in Schedule B of the estate tax return at the following values: Value as re-
turned by
Serial No.
Series
Petitioner
M8-621-612
G
$982.00
M8-621-613
G
982.00
M8-621-614
G
982.00
M8-621-615
G
979.00
M8-621-616
G
979.00
M8-621-617
G
979.00
M8-621-618
G
979.00
M8-621-619
G
979.00
M 559-246
K
967.00
M 559-247
K
967.00
M 559-248
K
967.00
M 559-249
K
967.00
M 559-250
K
967.00
The executrix, through the Bank of Cartersville, presented six United States savings bonds, Series G and K, for redemption on May 1, 1958. When the decedent died, her estate was eligible to redeem these six bonds at par value. At that time, the Federal Reserve Bank of Atlanta had not been notified of decedent's death. During May of 1960, the remaining seven bonds were presented for redemption. This presentation, having occurred after *61 the third interest date following decedent's death, barred redemption of these seven bonds at par. When decedent died, her estate was eligible to redeem these seven bonds at par value. The respondent, in his statutory notice of deficiency, found the value of the thirteen United States savings bonds, Series G and K, to be $1,000 each, or $13,000, on the date of valuation. Upon the death of an owner or co-owner, Series G and K United States savings bonds may be redeemed at par value before maturity. The only prerequisite for making such a redemption is the holding of the bonds by the decedent for at least six months before her death and the redemption of these bonds by the estate within three interest dates following decedent's death. (Rev. Rul. 55-301, C.B. 1955-1, 442.) Upon decedent's death, the estate was able to redeem at par all 13 of the Series G and K bonds which it held. At the times above referred to, the executrix, through the Cartersville Bank, presented the bonds for redemption. The Federal Reserve Bank of Atlanta was not advised of the death of the decedent when the first six bonds were presented for redemption. The executrix failed to present within *62 the required period the remaining seven bonds for redemption at par. As a result, the estate received a total of only $12,676 for the redemption of the bonds, instead of the $13,000 to which it was entitled. The fair market value of the 13 bonds contained in the estate must be determined as of the date of valuation which, in this case, is January 2, 1958. In determining their fair market value, due consideration must be given to the provision that the bonds may be redeemed at par. As previously stated, the estate, on January 2, 1958, could have redeemed all 13 of the bonds at par. On the date of valuation, therefore, the fair market value of these bonds was $1,000 each, or $13,000. Under the circumstances, we must agree with respondent's determination of $13,000 to be included in gross estate rather than the total of $12,676 reported by the estate. See Estate of Mary Gowdy, 21 T.C. 219 (1953), affd. sub. nom. Collins v. Commissioner, 216 F. 2d 519 (C.A. 1, 1954). IV-1. Findings of Fact Item 1 - Property - 1 North Wall Street Included as Item 1 in Schedule A (Real Estate) in the Federal estate tax return filed by petitioner is the property known as *63 1 North Wall Street, Cartersville, Georgia. The date of death was taken as the valuation date. In the estate tax return, the property was valued at $9,000. Respondent, in his statutory notice, determined the value of the property to be $11,000. At the date of valuation, the property was rented to the Clyde-Grace Shop at $75 per month, or $900 per annum. The property was at the corner of East Cherokee Street and North Wall Street, fronting 22 feet, 7 inches on North Wall Street. The building had a depth of 100 feet and contained 2,258 square feet. It was between 30 and 35 years old at the valuation date and had a remaining useful life of 20 to 25 years. The value of Item 1 included in the return was based upon a joint appraisal by three individuals who were generally familiar with real property values in the area. In making their appraisal, they relied upon their knowledge of such values and of the property in question, gave consideration to rentals, and had in mind as a limited comparative the fact that in March 1958 the property known as Bargain Store, located at 10 South Wall Street, was sold to Robert Shaw for $6,500. The Bargain Store had approximately the same front footage *64 on Wall Street and had 19 feet less depth. The Clyde-Grace property had 336 more square feet than the Bargain Store and was a corner lot. Respondent's expert witness (Hambrick) gave as his opinion that, as of the valuation date, the fair market value of the Clyde-Grace property was $11,000. He reached this conclusion on the basis of overall consideration of three approaches. The first of said approaches was the so-called "physical" approach which, in effect, purported to be replacement cost adjusted to the valuation date. The witness did not examine the property until April 16 and 17, 1962. Between the valuation date and the dates of the examination by the expert, substantial improvements to the property had been made including a new aluminum front, new plate glass windows, entire inside painted, new rear door, and some roofing work. The expert stated generally that he had taken these facts into consideration but did not explain to what extent. (Petitioner's expert gave as his opinion that the improvements resulted in an increase of $3,500 in the fair market value of the property.) As to the physical approach, respondent's expert arrived at a valuation figure of $11,300. The *65 so-called "economic approach" purported to be a capitalization of rents. The actual rental of the Clyde-Grace property was $900 per annum. The expert, however, did not use this figure. He concluded that the property was "under rented" and that the proper rent should have been $1,693.50, which, capitalized at 13 percent, produced a valuation figure of $13,000. Capitalization of the actual rental of $900 per annum at 13 percent would have produced a figure of $6,923. The so-called "comparison approach" purported to be a consideration of the selling price of comparable property. The only sale of any property in the area at a time reasonably close to the valuation date was the property already referred to at 10 South Wall Street, known as the Bargain Store, which was sold for $6,500 in March of 1958. The expert witness did not use this figure as a basis for his comparison. He concluded that the sale was a "bargain" sale and that the fair market value thereof was $9,000. He then used this figure as comparable to the value of 1 North Wall Street. The figure of $9,000 is the same as that reported in the Federal estate tax return. IV-2. Opinion Item 1 - Property - 1 North Wall Street
*66 Upon considering all the evidence relating to the 1 North Wall Street property, we conclude that petitioner has established by a preponderance of the evidence that its fair market value, as of January 2, 1958, did not exceed $9,000. In a situation such as the one confronting us, we realize that there are substantial difficulties of proof and that the determination of a precise dollar figure is almost impossible. The difficulties must be resolved, however, as well as circumstances permit. The appraisers who appraised the property for the estate tax return had a long familiarity with the property, its location, and the various local factors which would affect value. Lamar B. Hill, executive vice president of the First National Bank of Cartersville, who was one of the appraisers, testified at length, and impressed us favorably. We think he was fully competent to express an opinion, and his approach appeared to us as objective and practical. There are, of course, numerous tests which may be applied under given circumstances which may be of enough significance to balance or outweigh opinion testimony such as that presented by Hill. We do not find them here in relation to the item *67 in question. The respondent's expert used three approaches as set forth in our Findings. The first was the physical approach. We have given careful consideration to his testimony. As to the item in question, however, he had never seen it prior to April 16, 1962, and there had been substantial changes since the valuation date. While he no doubt gave some consideration to these factors, his testimony does not give a clear picture of the nature of such consideration or the effect on his conclusions. Hill's testimony to the effect that the improvements increased fair market value by $3,500 is not contradicted. While the testimony of respondent's exper relating to his economic approach is not without some value, it is, in substance, a begging of the question. He does not capitalize actual rents. His capitalization is based upon his opinion as to what the rental should have been. As such, it has no greater significance than his individual opinion. Much the same may be said about his comparative approach. He does not use an actual sale price for such comparison. He takes his comparative at a figure which in his opinion should have been the sale price, and uses the latter for comparative *68 purposes. Again, his opinion rather than his comparison is the only meat in his testimony as to this approach. Under all the circumstances, we hold that petitioner has established by a preponderance of the evidence that the fair market value of Item 1 at the valuation date was not in excess of $9,000 as included in the return. V-1. Findings of Fact Item 2 - Property - 11 North Wall Street Included as Item 2 in Schedule A (Real Estate) in the Federal Estate) in the Federal estate tax return filed by petitioner is the property known as 11 North Wall Street. In the return, the property was valued at $7,000. Respondent, in his statutory notice, determined the value of the property to be $10,000. At the date of valuation (January 2, 1958), the property was rented to Sewall Drug Store at $1,500 per annum. The property had a front on North Wall Street of 24 feet, 3 inches. The building on the property had a depth of 80 feet and contained 1,940 square feet. It was between 30 and 35 years old in 1958 and had a remaining useful life of 20 to 25 years. The value of Item 2 included in the return was based upon the same joint appraisal made by the same three individuals referred to *69 above under the heading "IV-1" hereof who were generally familiar with real property values in the area. In making their appraisal of Item 2, they relied upon their knowledge of such values and of the property in question; gave consideration to rentals; and had in mind as a limited comparative the sale of the Bargain Store referred to under the heading "IV-1" hereof. Hambrick's opinion was based upon approaches substantially similar in principle to those discussed in Item 1 but differed in the use of actual rent in his calculation. V-2. Opinion Item 2 - Property - 11 North Wall Street Upon the facts, while the general approaches are the same as in Item 1, supra, the ultimate picture is quite different. Petitioner relied upon the same appraisal as that referred to in Item 1. While, as already indicated, we were favorably impressed with the testimony of Lamar Hill, it does not follow that we must accept his opinion in all instances. Hambrick based his views on the same three approaches as in Item 1. With respect to the physical approach (cost of replacement less depreciation), he relied upon his examination of the property on April 16 and 17 of 1962. He had some awareness, *70 at least, that there had been improvements since the valuation date of January 2, 1958. The improvements consisted of a new ceiling, new flooring, new light fixtures, rewiring, fluorescent light tubes and miscellaneous minor items. These improvements, in the opinion of Hill, increased the value of the property to the extent of $3,000. As to the comparative approach, we think it necessary only to say that as to the item under consideration, it was of little assistance. The factor of significance which leads us to accept respondent's view on this item is the rental of $1,500 per annum. We realize that capitalization of rent may in many instances fail to paint the true picture of value. Moreover, while we emphasize it here, it is only in connection with consideration of all of the facts in the record. Hambrick's approach was a capitalization of the annual rent at 13 percent, or $11,500. Here, unlike Item 1, he used actual rent. The reasonableness of this ratio (in the absence of other factors not here present) is not questioned, and Hill testified that he himself used a "rule of thumb" in capitalizing rents for valuation purposes in the area at 1 percent based on monthly rent. The *71 result, in either instance, would not differ materially in relation to the issue now under consideration. We need not determine whether the result from capitalization of rents is precisely accurate. The value determined by respondent was $10,000. We think that a preponderance of the evidence supports this valuation, and that there was no error in the determination as to this issue. VI. Findings and Opinion Item 3 - Vacant Lot - 105-107 East Main Street Item 3 was, on the valuation date, a vacant lot next to Leachman's Garage, and numbered 105-107 East Main Street. The value as stated in the Federal estate tax return was $3,600. The respondent determined a fair market value of $4,300. Hambrick valued it at $4,900, on a basis of $100 per front foot. The lot had been rented for a total of three months at $20 per month. The testimony is vague and not too satisfactory but this may well have been due to the inherent difficulty of valuing a vacant lot under the circumstances. We think the opinion of Hill, who was personally familiar with the property and its location in relation to other properties, looking toward future utility, is to be accepted rather than a valuation by a *72 stranger to the area. We attach no significance to the rental which only continued for three months. We hold that petitioner has sustained the burden of proof as to this issue. VII. Findings and Opinion Item 4 - Property - 10 East Cherokee Street Included in the return as Item 4 was the property at 10 East Cherokee Street used at the date of valuation as Walker's Barber Shop. The value on the return (based on the appraisal, Schedule C), respondent's determination, and Hambrick's value were as follows: Return
$1,600
Determination
2,300
Hambrick valuation
2,600
The property had a front footage of 20 feet on East Cherokee Street. The depth was 22 feet, 7 inches. Some work had been done after the valuation date and prior to Hambrick's examination in April 1962. This included work on the roof and a new front door. Neither party suggested that there was any comparable data based on sales of like property. The rental of the property at the valuation date was $300 per year which, capitalized at 13 percent, resulted in a figure of approximately $2,300. Hambrick's physical approach to valuation was $2,850. No detailed analysis was offered on behalf of *73 petitioner. Upon consideration of all the circumstances, we hold that petitioner has failed to prove by a preponderance of the evidence that respondent erred in determining the value of Item 4 to be $2,300. VII. Findings and Opinion Item 5 - Property - 30-32 East Main Street Item 5 in the return was the property at 30-32 East Main Street, occupied at the valuation date by Nelson Insurance Co. and Dangler Real Estate Co. The property was returned at a value (as per the appraisal - Exhibit C) of $3,000. The statutory notice determined a value of $5,500. Hambrick's value was $10,500. The property fronted about 32 feet on East Main Street and had a depth of approximately 45 feet. It was 30 to 35 years old with approximately 40 percent remaining life. In Hambrick's physical appraisal in April 1962, he gave some consideration to the fact that there had been a new roof and new partitions since the valuation date. These increased the fair market value of the property by $1,000 to $1,500. The property was not in the central business district. Hambrick's physical approach resulted in a figure of $7,500 (land $3,200 and building $4,300). No realistic comparatives were suggested. *74 The annual rent totaled $1,625 from the two tenants, which capitalized at 13 percent per annum resulted in a figure of $12,460. In Hambrick's opinion, the rents were too high and he, therefore, reduced his figure on the economic approach to $10,500. Upon consideration of all relevant facts in the record on this item, we conclude that the preponderance of the evidence establishes a fair market value of Item 5 in an amount not less than $5,500 as of the valuation date. IX. Findings and Opinion Item 6 - Property - 28 East Main Street Item 6 in the return was property at 28 East Main Street occupied by Cagle's Barber Shop at the valuation date. The property was returned, as per appraisal (Exhibit C), at a value of $4,000. The statutory notice determined a value of $4,500. Hambrick's ultimate valuation was $5,000. The property fronted 18 feet 9 inches on East Cherokee Street and had a depth of 50 feet. It was 30 to 35 years old in 1958 and had a then remaining useful life of between 20 and 25 years. After the valuation date, and prior to Hambrick's appraisal in April of 1962, a new roof was put on the building and new draperies were hung. The improvements increased the value *75 of the property to the extent of about $1,500. Hambrick gave general consideration to the improvements to eliminate their consideration in backcasting his physical approach to 1958. The property was not in the center of the business district. Hambrick's physical approach resulted in a figure for the land of $1,875 (based on his opinion of $100 per front foot) and the building at $2,814 based on adjusted reconstruction cost, resulting in a total value of about $4,700 on the physical approach. No realistic comparisons were available. The rental as of the date of valuation was $720 a year, which capitalized at 13 percent resulted in a total of $5,540. Upon consideration of all relevant facts in the record relating to this item, we conclude that petitioner has failed to establish by a preponderance of the evidence a fair market value for Item 6 less than $4,500 as of the valuation date. (Note: For reasons which will become apparent infra, we consider Items 7 and 9 together under Heading XI subsequent to Item 8, Heading X.) X. Findings and Opinion Item 8 - Property - 24 South Wall Street Item 8 in the return was property at 24 South Wall Street, occupied at the valuation *76 date by McConnell's Cloth Shop, and at the time of trial by Summey's Beauty Center. The property was returned as per appraisal (Exhibit C) at a value of $5,500. The statutory notice determined a value of $6,250. Hambrick's ultimate valuation was $11,000. The property fronted 21 feet 4 inches on South Wall Street with a depth of 80 feet. It was between 30 and 35 years old at the valuation date, at which time it had a remaining useful life of 20 to 25 years. Some light is thrown on the value of the property as of the valuation date by comparison with the Bargain Store, which was similar in many respects to the then McConnell's Cloth Shop, and was only one door away. The Bargain Store sold in 1958 for $6,500. Petitioner explains the appraisal and return of Item 8 at $5,500 substantially on the ground that the Bargain Store was in excellent condition at the valuation date while McConnell's Cloth Shop was not; that the Bargain Store was somewhat larger; and that the Bargain Store had facilities for loading and unloading in the rear. Hambrick, in what he refers to as a comparison, first revalues the Bargain Store at $9,000 and then attributes the revaluation to McConnell's Cloth *77 Shop. Although proper consideration is to be given to Hambrick's opinion, it is apparent from our discussion under Heading IV that it is not a comparison based on the sale price of the Baragin Store and represents merely his independent opinion of the value of the Bargain Store which he then extends to McConnell's Cloth Shop. Hambrick's physical approach took into consideration replacement cost adjusted to remaining useful life of the building and reached a value of $5,118 for the building itself as of the valuation date. He valued the land at $3,199, based on a figure of $150 per front foot. His total on the physical approach was rounded into a figure of $8,300. Hambrick gave some consideration to the fact that between the valuation date and his examination (April 1962) improvements had been made including new light fixtures, new front door, new rear door and rear entrance, general renovating, repainting, and work peculiar to beauty shop occupation. Hill testified that the improvements referred to in the preceding paragraph increased the fair market value of the property by about $5,000. The rental at the valuation date was $1,800 per annum, which capitalized at 13 percent *78 produced a valuation of $13,800. We have given careful consideration to the foregoing evidence, but do not think it would serve any useful purpose to analyze it further except to say that we think it evident from all the surrounding circumstances that the described property, producing an annual rental of $1,800, must have had a fair market value of not less than $6,250. We, therefore, find no error in respondent's determination on this issue. XI. Findings and Opinion Item 7 - Property - 26 South Wall Street Item 9 - Property - 26 East Main Street These items are considered together because of interrelation of rentals. There is some confusion in the record in relation thereto, but after reviewing the details of the evidence, we find as a fact that the combined annual rent of the two properties at or about the date of valuation was $3,600, which capitalized at 13 percent would result in a combined figure of approximately $27,700. Item 7, 26 South Wall Street was occupied at the date of valuation by Jordan's Shoe Store. The property was returned as appraised (Exhibit C) at a value of $25,000. The statutory notice determined a value of $27,500. Hambrick's ultimate valuation *79 was $27,000. The property was a two-story building on a corner lot, fronting 35 feet 10 inches on South Wall Street, with a depth of 80 feet. The floors were hardwood. It was 30 to 35 years old with a remaining useful life of 20 to 25 years. Hambrick's physical approach gave some consideration to replacement cost adjusted to remaining useful life of the building and reached a value of $17,196 for the building and $7,166 for the land, or a total on this approach of $24,350. Hambrick, in his physical approach, gave some consideration to the fact that between the valuation date and his examination (April 1962) improvements had been made including partitions, air conditioning, roof repair, light fixtures, painting and renovation. Hill testified that these improvements increased the fair market value of the property by $4,000. No effective comparison was available. Hambrick's purported capitalization of rents merely represents his opinion based upon what he thought the rental should be rather than capitalization of actual rental. Item 9, 26 East Main Street, was occupied by the shoe department or shoe store belonging to Jordan's Department Store. The property was returned *80 as appraised (Schedule C) at a value of $3,000. The statutory notice determined a value of $4,250. Hambrick's ultimate value was $4,300. The property fronted 19 feet, 3 inches on East Main Street, with a depth of 50 feet. It was 30 to 35 years old at the valuation date and as of that date had a 20 to 25 year useful life. No effective comparison was available. Hambrick, in his physical approach, gave some consideration to the fact that between the valuation date and his examination (April 1962) improvements had been made, including new front, partitioning, painting and renovation. Hill testified that these improvements increased the fair market value of the property by $2,000. Hambrick reached a figure of $2,874 as of the valuation date for the building on a basis of replacement cost adjusted to the valuation date. He valued the land at $1,917, or a total of $4,800 for land and building. We have already noted that, on a correct capitalization of rents, a valuation of $27,700 would be reached for the two properties considered together. This total is less than the respective values returned ($25,000 and $3,000). We have also noted that there were no effective comparisons available. *81 Hambrick's physical approach to the value of Item 7 was $24,350 - also less than the amount returned. As to his physical approach to Item 9, his result was $4,800 which exceeded both the amount returned ($3,000) and the amount determined by respondent ($4,250). On the state of the record as to Items 7 and 9, we are satisfied that the opinions of Hill and the other two appraisers, who were fully familiar with the properties and locations over a long period, establish by a preponderance of the evidence that Item 7 had a fair market value as of the valuation date of not more than $25,000 and that Item 9 as of the same date had a fair market value of not more than $3,000. Decision will be entered under Rule 50.